THE STATE, EX REL. HOEFFLER ET AL., *v.* GRISWOLD, DIR. OF DEPT. OF PUBLIC WELFARE, ET AL.

(Decided January 28, 1930.)

*Mr. W. S. Pealer,* for plaintiffs.

*Mr. Gilbert Bettman,* attorney general, *Mr. Charles G. Williams,* and *Mr. Joseph V. Ralston,* for defendants.

HORNBECK, J. This action was instituted in the court of common pleas by plaintiffs as taxpayers, for themselves and others similarly situated, seeking an injunction restraining defendants from proceeding to carry out a contract with Robert H. Evans & Co. for the construction of certain buildings at the Institution for Feeble-Minded at Apple Creek, and praying that the contract be declared illegal, unconstitutional and void, and that, if found to be legal, defendant Griswold, director of the department of public welfare, be required to award a contract for the construction of the buildings according to law, and for other equitable relief. The issues were

joined and the cause tried in the court of common pleas, and it comes into this court on appeal.

There are two questions raised: First, was the enactment of that part of House Bill No. 203 relating to the appropriation for the Institution for Feeble-Minded at Apple Creek in violation of the State Constitution? Second, was there collusion between the successful bidder and Hal. H. Griswold in causing said award to be made to Robert H. Evans & Co., or is the pretended award illegal and void and contrary to law because it undertakes to require by contract the erection of certain alternates known as G-7 and G-2-B.

Section 22, Article II, of the State Constitution, provides: "No money shall be drawn from the treasury, except in pursuance of a specific appropriation, made by law; and no appropriation shall be made for a longer period than two years."

Without extended discussion, suffice to say that we are of opinion that the appropriation under consideration as it appears in House Bill No. 203 is not in violation of the State Constitution, that it is a specific appropriation, and that the purpose is sufficiently defined. The power of the Legislature to reappropriate is as broad as it is to appropriate originally.

The fact that the money set apart had, by the former Legislature, been itemized as to its distribution, was not compelling upon the General Assembly in the act of reappropriation. The history incident to this legislation establishes that the General Assembly acted with knowledge when it took from House Bill No. 203 the items theretofore appearing in the former appropriation. The form of appropriation under consideration has many times

during a period covering a number of years been accepted as proper procedure, and, while this is not controlling, it is to be weighed in judicial determination.

This court, in the case of *Long* v. *Board of Trustees of Ohio State University,* 24 Ohio App., 261, 157 N. E., 395, had under consideration a somewhat analogous act, which was sustained.

Coming now to the second question, we say without hesitation that there is nothing in this record which tends in the slightest degree to establish that Mr. Griswold and the declared successful bidder, Robert H. Evans & Co., were in collusion in any manner whatever to improperly direct or control the award of the contract as made. But it is not necessary that plaintiffs, to succeed in this action, should do more than establish that the awarding of the contract to Robert H. Evans & Co. under the specifications for the buildings at Apple Creek was illegal.

The record is voluminous, and we are dealing in a highly specialized field. There are, however, some outstanding features of the situation with which bidders were confronted that seem to us not difficult of understanding.

The specifications were prepared by an eminent architect, and in great detail, as they are required to be by law. They set forth what the successful contractor was expected to do in the way of construction of the improvement at Apple Creek. Bids were tendered and accepted upon the basis of these specifications. The method adopted in tabulating the bids to which objection is made relates to the floors and fills on the second floor of the cottages to be erected.

The specifications provide for base, alternate G-2-B, and alternate G-7 bids. It is apparent that the floors provided for in the base bid, alternate G-2-B, and alternate G-7, were both complete floors. Had the base bid been accepted and the work completed, there would have been a concrete slab of two inches to which there would have been added a cement fill of three inches, smoothly finished. Had alternate G-2-B been accepted, the depth from the top of the floor to the bottom of the concrete slab would have been substantially the same as in the base; the variance in the two types of construction being that, instead of cement fill and finish, there would have been a terrazzo finish and fill, and this only differed in the half-inch composition at the surface. Had alternate G-7 been accepted, the completed floor would have consisted only of the concrete slab with an integral finish, which required a smoothing up with trowel after a certain top dressing of sand and a base of cement around the walls. In all instances the floor would have been at the same elevation.

It is interesting to note that the specifications definitely provided that, in the event of the acceptance of alternate G-7, the contractor would be required to raise the concrete slab three inches to bring it up to the level required for the floor. It is evident that, as the base bids, alternate G-7, and alternate G-2-B, each contemplated completed floors, to let a contract requiring the bidder to observe the *exact requirements* of the specifications in constructing alternate G-7, and thereafter to superimpose alternate G-2-B floor, and fill thereon, could it be done, would be thoroughly impractical and a useless performance.

It is difficult to understand how a contractor could estimate that he could construct two floors more cheaply than one; that he could complete alternate G-7, requiring top dressing of sand thereon, smooth it up with trowel, i. e., make the integral finish, then cover that completed floor with terrazzo fill and finish, more cheaply than he could construct the G-2-B alone; but that is the result of the tabulation of the bids as made.

It is obvious that alternate G-2-B alone would be less expensive, and the fact that the combined bid was less than alternate G-2-B lends some credence to the claim that it was not expected to build G-7.

If a bidder knew that alternate G-7 modified would be accepted in combination with alternate G-2-B, then the concrete slab in alternate G-7 could be left unfinished as in the base, all of the base of cement around the walls required in alternate G-7 could be utilized for alternate G-2-B, and a marked saving could be expected. This plan was feasible, but it was not proposed, and the bidders knew nothing of it.

The bidders had every reason to assume that, if alternate G-2-B was accepted, it would not be in conjunction with G-7. The state clearly had the right, if alternate G-2-B was desired, to tabulate the bids upon the cost of that construction, in connection with the base bid, because the specifications so stated, but to permit also the cost of alternate G-2-B to be determined by the base bid plus alternate G-2-B, less alternate G-7, enabled the architect to employ two separate and distinct methods of deciding the low bid.

The insurmountable situation with which defendants are confronted is that no bidder relying on information imparted by the specifications, as he had a

right to do, could determine that, in order to secure G-2-B construction, the state would first require G-7 construction. The specifications disclose no purpose to do any such thing. The discretion of the director of public works can only be exercised with respect to such matters as could in reason be anticipated as included in the specifications.

It is incumbent upon the state in taking bids to apprise prospective contractors of that which they might reasonably be expected to do. They were informed that, if alternate G-7 construction was adopted, it would be necessary to raise the concrete slab three inches. How can it be said that bidders should have known that the state would accept a bid for G-7 construction, and that in so doing, after requiring the slab to be finished and raised, expected it to be unfinished and lowered three inches to comply with the elevation required in the base bid and in alternate G-2-B?

It is obvious that, notwithstanding it is claimed that it is purely an engineering problem, G-7 and G-2-B cannot both be completely constructed. As one witness aptly puts it: ''You can accept it but you cannot build it.''

No bidder was put on notice that in order to secure alternate G-2-B construction the state would observe the process of going through alternate G-7 construction to secure it.

We are therefore unanimously of the opinion that the contract as proposed to be awarded was illegal and that it should be set aside. The prayer of the petition will therefore be granted.

*Injunction allowed.*

KUNKLE, P. J., and ALLREAD, J., concur,